**TIFD III–X LLC, Plaintiff and Counterclaim Defendant,**

v.

**FRUEHAUF PRODUCTION COMPANY, L.L.C. and Fruehauf Antrim Limited Partnership, Defendants and Counterclaim Plaintiffs.**

No. C.A. 20488–NC.

Court of Chancery of Delaware.

Submitted: June 7, 2004.
Decided: June 28, 2004.

Srinivas M. Raju, Jeffrey L. Moyer, Candice M. Toll, and Elizabeth C. Tucker, Richards Layton & Finger, P.A., Wilmington, DE, for Plaintiff and Counterclaim Defendant.

Vernon R. Proctor, and Patricia L. Enerio, the Bayard Firm, Wilmington, DE; Jay Horowitz, and Peter Forbes, Horowitz Wake & Forbes, Denver, CO, for Defendants and Counterclaim Plaintiffs.

## OPINION

STRINE, Vice Chancellor.

This case involves an interesting question regarding the doctrine of recoupment. A limited partnership agreement contains provisions governing the distribution of the partnership's economic benefits to its equity holders. Those provisions grant 1% of the profits to the general partner until a certain calculation comparing the sole limited partner's capital contributions to the economic benefits it receives from the partnership yields a positive balance, and then increases to 25% after that time. The limited partner has exercised its right to cause dissolution and has sought a declaration regarding the proper interpretation and application of the distributional provisions of the agreement.

As one of its responses, the general partner filed a recoupment claim alleging that the limited partner breached the partnership agreement in several respects many years ago, to the economic detriment of the partnership—i.e., the general partner has pled a recoupment claim based on time-barred derivative claims belonging to the partnership itself. In that vein, the general partner says that the partnership would have reaped greater profits had the limited partner not breached the partnership agreement, profits that, if reaped, would bring the parties much closer to the point at which the upward change from 1% to 25% in the general partner's share of profits occurs. Thus, the general partner says that in the liquidation the partnership's books and records should reflect the value of the recoupment claim, allowing the general partner to receive a greater share of the remaining assets of the partnership.

In this opinion, I address the limited partner's motion for judgment on the pleadings against the recoupment claim. I find that the general partner's authority to act as liquidator does not include the unilateral right to itself determine the value of its recoupment claim. More importantly, the general partner cannot revive stale derivative claims belonging to the partnership under the guise of recoupment. In this case, the limited partner has sought declaratory relief seeking an interpretation and application of the distributional provisions of the partnership agreement. The general partner argues that the required transactional nexus exists between its recoupment claim and the interpretative claim because if the partnership had not been injured by the limited partner, it would have been more profitable and the 25% payout percentage would apply to a larger portion of the assets in the liquidation. That is, under the general partner's reasoning, whenever the percentage to be paid to the different equity holders of a business entity is influenced by the value of the entity, and one equity holder seeks a determination of how the entity's proceeds are to be distributed, such as in the context of a liquidation, time-barred derivative claims spring back alive as recoupment claims. In essence, the general partner contends that any value-affecting claim of breach of a business entity's governing instrument (such as a partnership agreement or certificate of incorporation) that arises at any time during the life of a business entity is transactionally related to any claim for an interpretation and application of the payout provisions of the entity's governing instrument, at least so long as a determination of the claim of breach would affect the distributional split of the entity's proceeds.

For a variety of reasons set forth in the opinion, I conclude that this reasoning is flawed and leads to inefficient and inequitable results. Investors of capital ought to be able to exercise their contractual and statutory rights to dissolve or liquidate business entities without fear that every derivative (or other internal affairs-related) damage claim that ever arose during the life of the entity will thereby be resuscitated for the purpose of ascertaining who gets what's left of the entity's assets. Delaware public policy is to the contrary and encourages the timely assertion of claims involving the internal affairs of business entities, providing certainty to investors and fair treatment of fiduciaries who would otherwise be forced to defend claims at a time when exculpatory evidence and accurate memories may well be gone. Therefore, I grant the limited partner's motion for judgment on the pleadings.

I also address the general partner's motion to dismiss the limited partner's claim requesting an application of the partnership agreement's payout provisions and to

dismiss the general partner's own recoupment claim, which is premised on the argument that those claims are not justiciable because they are not ripe. I find that this argument is based on a misreading of the limited partner's complaint and otherwise lacks merit, and therefore deny that motion.

## I. *Factual Background*

TIFD III-X LLC ("TIFD") is a Delaware limited liability company that is the sole limited partner of Fruehauf Antrim Limited Partnership (the "Partnership"), also a Delaware entity. Fruehauf Production Company, LLC ("Fruehauf"), a Michigan limited liability company, is the general partner of the Partnership. The Partnership, formed by a partnership agreement between TIFD and Fruehauf executed in 1996 (as amended, the "Partnership Agreement"), is in the business of developing natural gas wells in Michigan.

When the Partnership was formed, TIFD, which is wholly owned by a division of General Electric Corporation, contributed 99% of the funding for the Partnership. Fruehauf, which (either itself or through affiliated entities) has operated natural gas wells in Michigan since 1940 and owned interests in and operated over 100 wells in Michigan, contributed only 1%, but as general partner it was given responsibility over the day-to-day management of the Partnership.

The Partnership Agreement's allocation of the economic benefits and burdens generated by the Partnership to TIFD and Fruehauf, as equity owners of the Partnership, is determined by a contractual formula whose meaning is disputed in this lawsuit. Its precise mechanics are unimportant for purposes of the present motions, but its general terms are relevant. To simplify, the allocation differs depending on whether the Partnership is in the "Phase I Period" or "Phase II Period." During the Phase I Period, the "LP Sharing Percentage" (or TIFD's share) is 99% and the "GP Sharing Percentage" (or Fruehauf's share) is 1%, while during the Phase II Period, the LP Sharing Percentage is 75% and the GP Sharing Percentage is 25%.[1] The "flip" from Phase I to Phase II occurs at "the end of the first month in which Cumulative Payout is greater than or equal to zero."[2] "Cumulative Payout," in turn, means "with respect to each month, the sum of such month's Monthly Payout [to TIFD] plus all previous months' Monthly Payouts minus the Capital Contributions made by the Limited Partner pursuant to the terms hereof times the Discount Factor."[3] The meaning of Cumulative Payout is the central question in this litigation.

The parties have not always seen eye-to-eye on the management of the Partnership. In 2002, TIFD wished to explore a sale of assets of the Partnership, but Fruehauf resisted. Most pertinently, around that time a dispute arose regarding the manner in which Cumulative Payout is calculated, with Fruehauf asserting a method that differed materially from that historically used by the parties and that substantially affected the economics of the Partnership Agreement. Under the previously used method, which TIFD asserted was the correct one, the calculation of Cumulative Payout as of August 2002 yielded a net balance of $30 million in Monthly Payouts that still needed to be made to TIFD before the flip from Phase I to Phase II

---

**1.** Agreement at 7, 9.

**2.** *Id.* at 11.

**3.** *Id.* at 5. The Discount Factor for any particular month is found on a table appended to the Agreement.

occurred. Under Fruehauf's interpretation, the balance was approximately $7 million.

On August 13, 2003, TIFD initiated this litigation seeking a declaratory judgment that the Partnership Agreement requires that TIFD receive an 8.50% after-tax return on its capital contributions to the Partnership in order for "Cumulative Payout" to be greater than or equal to zero and the flip from Phase I to Phase II to occur (defined by TIFD in the complaint as the "Reversion Point"). In its second *ad damnum* clause seeking relief, TIFD also sought to have the court "determin[e] the appropriate Reversion Point and Cumulative Payout pursuant to the Partnership Agreement."[4] That same day, TIFD provided Fruehauf with notice that it was exercising its right under § 10.1(g) of the Partnership Agreement to cause dissolution any time after December 31, 2002.

Fruehauf filed its answer and a counterclaim on September 15, 2003, seeking a declaratory judgment concerning its rights as liquidator of the Partnership pursuant to the Partnership Agreement. On March 19, 2004, TIFD amended its complaint to add a count seeking reformation of the Partnership Agreement if the court determined that Fruehauf's interpretation of Cumulative Payout was correct. When Fruehauf filed its amended complaint and counterclaim in response, it raised, less than three months before trial was scheduled, a claim of recoupment against TIFD based on numerous alleged breaches of the Partnership Agreement over the life of the Partnership (the "Recoupment Claim"). Fruehauf asserted the Recoupment Claim both as an affirmative defense and as a separate counterclaim, and requested, among other things, a declaratory judgment that

In liquidating the Partnership and determining the parties' relative distributive shares, Fruehauf is entitled to determine the extent of any losses of revenue and/or tax credits suffered by virtue of TIFD's breaches of the Partnership Agreement, and to subject any asserted entitlement by TIFD to proceeds from the liquidation and winding up of the Partnership to claims in the nature of recoupment to the extent of those losses, which are estimated to exceed $10,000,000 and which may well exceed $20,000,000, including the consideration of the extent of those losses in calculating the revenues the Partnership should be deemed to have received for purposes of calculating Cumulative Payout, regardless of which party's interpretation of the Cumulative Payout provisions of the Partnership Agreement ultimately prevails[.][5]

TIFD has moved for partial judgment on the pleadings under Rule 12(c), arguing that Fruehauf's Recoupment Claim fails as a matter of law. Fruehauf opposes that motion and has itself filed a motion to dismiss, without prejudice, the claim in the second *ad damnum* clause of TIFD's complaint, contending that that claim (as Fruehauf understands it) is not ripe and therefore not justiciable. Moreover, because, according to Fruehauf, the Recoupment Claim is responsive to the claim in the second *ad damnum* clause, Fruehauf argues that its own Recoupment Claim should be dismissed without prejudice as unripe.

This is the court's disposition of both of those motions.

## II. *Legal Analysis*

### A. *Fruehauf's Rule 12(c) Motion*

Under Court of Chancery Rule 12(c), the court must accept as true all of the non-

---

4. Am. Compl. at 9 ¶ b.

5. Am. Countercl. ¶ 46(d).

moving party's well-pleaded factual allegations and draw all reasonable inferences in favor of the nonmoving party, and may grant a motion for judgment on the pleadings where "there is no material fact in dispute and the moving party is entitled to judgment as a matter of law." [6] Here, there are no factual disputes and the parties' disputes are purely legal.

The central legal dispute between the parties concerns whether Fruehauf's Recoupment Claim based on TIFD's alleged breaches of the Partnership Agreement is valid. "Recoupment is a common-law, equitable *doctrine that permits a defendant to assert a defensive claim aimed at reducing the amount of damages recoverable by a plaintiff." [7] To be understated about it, the equitable doctrine of recoupment is not a precisely defined one, either in Delaware or in other jurisdictions. Unsurprisingly, TIFD and Fruehauf therefore each read the relevant authorities to define the contours of that doctrine somewhat differently. But, for purposes of the pending motions, the parties agree on the core requirements of the doctrine that determine whether the Recoupment Claim is sustainable.

"[T]o prevail on a recoupment claim, the defendant must show [among other things] that ... the recoupment claim arises out of the same transaction or occurrence as the plaintiff's suit [and] the claim is purely a defensive set-off and does not seek an affirmative recovery from the plaintiff." [8] Moreover, "[b]oth the primary damages claim and [the] claim in recoupment must involve the same litigants." [9]

Here, I conclude that Fruehauf's Recoupment Claim fails to satisfy the required elements. Most critically, I conclude that the Recoupment Claim clearly does not arise out of the same transaction as TIFD's claims and that it therefore must be dismissed.

As a starting point to explaining why, some general observations about Fruehauf's Recoupment Claim are in order. First, it is critical to note that the claims that undergird the Recoupment Claim belong to the Partnership, not Fruehauf, because they involve harms that fell, in the first instance, on the Partnership as a whole and only affected Fruehauf indirectly, as a consequence of its ownership interest in the Partnership. The primary basis for the Recoupment Claim is that TIFD violated § 7.2(a) and (b) of the Partnership Agreement, which provide that "[t]he Limited Partner shall not: (a) be permitted to take part in the business or control of the business or affairs of the Partnership, [or] (b) have any voice in the management or operation of any Partnership property." [10] The harm that these violations caused was not to Fruehauf directly, however. Rather, TIFD's alleged "pervasive" interference with the Partnership's operations, in *contravention of these provisions, caused the Partnership to be less profitable than it would have been had Fruehauf had its way.[11] The fact that only TIFD and Fruehauf, and not the Partnership itself, are the parties to the Partnership Agreement does not transform any breach of the Agreement by one party into a direct harm

6. *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.,* 1992 WL 181718, at *1 (Del.Ch. July 28, 1992), *rev'd on other grounds,* 624 A.2d 1199 (Del.1993).

7. 80 C.J.S. *Set-off and Counterclaim* § 2 (2000).

8. *Id.* § 37.

9. *Id.* § 66.

10. Agreement § 7.2(a)–(b).

11. *See* Am. Countercl. ¶¶ 39–40.

to the other; if Fruehauf sought an affirmative damage award from TIFD to remedy the harm caused by the alleged breaches (which it purportedly does not), that would be a derivative claim because any harm suffered was to the Partnership as a whole, and any recovery would go to the Partnership.[12] Fruehauf acknowledges the essentially derivative nature of these harms when it alleges that the "actions and breaches by TIFD caused *the Partnership* to lose revenues and/or tax credits well in excess of $10,000,000 and likely in excess of $20,000,000." [13]

Second, Fruehauf admits that the wrongdoing alleged in its Recoupment Claim occurred at the latest in the late 1990s. Counsel for Fruehauf conceded at oral argument that any affirmative request for damages based on TIFD's alleged breaches of contract would therefore be time-barred, as the three-year statute of limitations in 10 *Del. C.* § 8106 has long since expired.

■ These two important facts—that Fruehauf's Recoupment Claim raises claims that 1) belong to the Partnership and 2) are time-barred—explain why Fruehauf has taken its current course of relying upon the doctrine of recoupment. To proceed in the expected fashion by filing affirmative claims, Fruehauf would face the insuperable bar erected by its own torpor because it had full notice of these claims within the expected time for suit.

Indeed, it is for this reason that Fruehauf has attempted to assert these breach of contract claims in the form of the Recoupment Claim: To the extent that a valid recoupment claim is asserted defensively, it is not subject to statutes of limitations.[14]

■ Furthermore, the requirements of the doctrine of recoupment have also shaped Fruehauf's strategy. It disclaims any intention to hold TIFD liable to the Partnership for breach of the Partnership Agreement via the doctrine of recoupment because that doctrine does not permit the defendant to obtain affirmative relief.[15]

In light of these concerns, Fruehauf has eschewed a claim for damages for the losses to the Partnership supposedly caused by TIFD's breaches. Instead, it seeks only the right to "consider" the extent of those losses in calculating Cumulative Payout. In its most aggressive stance, Fruehauf asserts that, as liquidator of the Partnership's assets, it has the contractual right under the Partnership Agreement to itself determine the extent to which those losses to the Partnership caused a delay in the point at which the "flip" from Phase I to Phase II otherwise would have occurred. An example should illustrate the curious form of relief that Fruehauf seeks. Assume that the calculation of Cumulative Payout as of a recent date (under whatever method) results in a balance of $30 million in payments that must be made to

---

**12.** See *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del.2004).

**13.** Am. Countercl. ¶ 40 (emphasis added). If TIFD caused the Partnership to forego such large amounts of revenue, such a course of conduct would appear, at first blush, economically irrational given that at the time TIFD purportedly engaged in such actions it had a claim to 99% of the Partnership's revenues.

**14.** See *PNC Bank v. Turner*, 659 A.2d 222, 225 (Del.Super.1995).

**15.** See *MCI Telecomm. Corp. v. Wanzer*, 1990 WL 91100, at *13 (Del.Super. June 19, 1990); *Floyd v. Ballenger*, 258 A.2d 911, 913 (Del.Super.1969); 20 Am. Jur. 2d *Counterclaim, Recoupment, and Setoff* § 5 (1995) ("As a defense, recoupment cannot be used to obtain affirmative relief. Recoupment applies only by way of reduction, mitigation, or abatement of damages claimed by the plaintiff and is not an independent action.").

TIFD under the Phase I allocation ratio before the "flip" to Phase II occurs and Fruehauf begins collecting 25% rather than 1% of the Partnership's payouts. Assume further that the Partnership immediately ceases all operations and that the total assets that will ultimately be distributed to the partners have a value of $40 million, but Fruehauf believes that TIFD's breaches resulted in losses of, say, $10 million to the Partnership.

Under these assumed figures, without the Recoupment Claim, Fruehauf would be obligated to distribute $30 million to TIFD (and $300,000 to itself) before the flip to Phase II would occur, leaving Fruehauf with a 25% claim only with respect to the $9.7 million that remained after these payments were made. What Fruehauf really is asking for in its Recoupment Claim, then, is the authority to 1) hypothetically (but not actually) increase the Partnership's balance sheet by $10 million up to $50 million to take account of that Claim, 2) hypothetically (again, not actually) pay $9.9 million out to TIFD and $100,000 to Fruehauf according to the Phase I ratio, and then 3) actually distribute the existing $40 million corpus of the Partnership as if the hypothetical payments had been made, such that TIFD would receive only $20.1 million (i.e., $30 million minus $9.9 million in hypothetical payments) before the flip to Phase II occurred, and Fruehauf could take 25% of the nearly $20 million that remained. Throughout this process, Fruehauf's determination of the value of the so-called Recoupment Claim would be bound only by its fiduciary duties, and perhaps a requirement of reasonableness and good faith, or so it says.

The problem with Fruehauf claiming this sort of authority is that it finds no support in the terms of the Partnership Agreement or the Delaware Revised Uniform Limited Partnership Act ("DRULPA"). There is no provision in that Agreement or the DRULPA allowing Fruehauf, as general partner, to determine unilaterally that the financial data from which Cumulative Payout is calculated should include a hypothetical adjustment based on what Fruehauf believes the Partnership's balance sheet would have looked like had TIFD not taken certain actions. On the contrary, the Partnership Agreement constrains how the general partner calculates Cumulative Payout. During the life of the Partnership, Fruehauf is obligated to prepare quarterly financial statements "including a balance sheet and statements of income, Partners' equity, status of Cumulative Payout and cash flows, *prepared in accordance with generally accepted accounting principles.*" [16] When annual financial statements are prepared, those must be accompanied by a report by independent certified public accountants.

Similarly, the general partner's responsibility to calculate Cumulative Payout when the Partnership is in liquidation does not bestow unlimited authority as to how that calculation is performed. In acting as liquidator, the general partner must, after dissolution and again after final liquidation, "cause a proper accounting to be made by the Partnership's independent accountants of the Partnership's assets, liabilities and operations through the last day of the month in which the dissolution occurs or the final liquidation is completed." [17] Then, after paying or providing for the Partnership's debts or liabilities, the general partner must adjust the partners' capital accounts by performing a deemed sale: It must 1) assume the sale of the Partnership's *assets* for cash at fair mar-

---

16. Agreement § 8.2(e) (emphasis added).

17. *Id.* § 10.3(a).

ket value (as determined by an appraiser selected by the limited partner); 2) assume the distribution of such cash according to the percentages required under the Partnership Agreement, "taking into account whether Cumulative Payout has occurred or would occur as a result of such distribution"; and 3) debit or credit the partners' capital accounts with their respective shares of the hypothetical gains or losses resulting from the assumed sales in the same manner as the accounts would be debited or credited for gains or losses on actual sales. The general partner must then "distribute to the Partners such amounts as are required to pay the positive balances of their respective capital accounts." [18]

Nowhere in this scheme does the Partnership Agreement give Fruehauf the capacious authority it claims, which is to itself determine the extent to which any losses caused by TIFD's breaches caused the running balance of Cumulative Payout to be lower than it otherwise should have been. Cumulative Payout is a formula applied to "Monthly Payouts" and "Capital Contributions," defined terms under the Partnership Agreement based on actual revenues and costs and other financial data. When the result of that formula is positive, the allocation of economic benefits under the Partnership Agreement changes. The general partner's authority to perform that calculation requires that it (and, on an annual basis, the Partnership's independent accountants) apply "generally accepted accounting principles" during the life of the Partnership and perform the deemed sale called for during the liquidation process based on the fair market value of the Partnership's assets as determined by an appraiser selected by the limited partner. The value of the asset that Fruehauf seeks to include on the

Partnership's balance sheet for purposes of calculating Cumulative Payout—i.e., any claim that the Partnership might have had against TIFD for breaches of the Partnership Agreement—would almost certainly be appraised at zero because Fruehauf admits that the claims are time-barred. Therefore no court would award the Partnership—the entity supposedly injured by TIFD's actions—a single penny from TIFD on such a claim. But Fruehauf somehow escapes the consequences of that fact because it gets to construct its own counterfactual world based on its own judgment about how big the Partnership pie should have been and then slice up the actual assets and remaining revenues as if that world were reality.

Not only is that inconsistent with the terms of the Partnership Agreement, but it demonstrates that the so-called Recoupment Claim is not a recoupment claim at all. Fruehauf does not seek to have a court mitigate a potential monetary award against it by taking into account damages that it itself suffered at the hands of the plaintiff. Rather, Fruehauf seeks a declaratory judgment that the responsibility vested in it by the Partnership Agreement to calculate Cumulative Payout carries with it the authority to act as the arbiter of disputes between the parties regarding their adherence to the terms of the Partnership Agreement and their fiduciary duties without regard to the legal and equitable rules normally governing claims, including statutes of limitations and laches. Put simply, rather than using recoupment to play on-the-court defense, Fruehauf seeks to use it to play off-the-court offense: It seeks the broad power to determine, by fiat, the value of the Recoupment Claim and its impact on Cumulative Payout—that is, to calculate Cumulative Pay-

18. *Id.* § 10.3(b).

out as if the Partnership had received a damages award—and distribute the Partnership's assets accordingly. After Fruehauf exercised that power, TIFD's only remedy would be to sue Fruehauf yet again and claim that Fruehauf's valuation of the Recoupment Claim was wrongful.

At oral argument, counsel for Fruehauf appeared to back off from this aggressive claim and suggested that it could be the court, and not Fruehauf, that determines the value of the Recoupment Claim and how it affected Cumulative Payout. In any event, the Recoupment Claim still does not satisfy the requirements of the recoupment doctrine. Fruehauf's use of the recoupment doctrine is novel and complicates the ability to make the determination of whether the Recoupment Claim involves the "same parties" as TIFD's primary claims. In this case, TIFD is not alleging that Fruehauf owes it damages. TIFD simply wants to have the payout formula of the Partnership Agreement interpreted and applied in a manner that will maximize its, rather than Fruehauf's, share of the Partnership's liquidating assets. That is, TIFD has sued Fruehauf primarily to determine which party's interpretation of the Partnership Agreement is correct. The Recoupment Claim, if sustained, would not offset directly any payment owed by Fruehauf to TIFD. Rather, it would accelerate the change from Phase I to Phase II, having the indirect effect of increasing Fruehauf's share of the liquidating assets and decreasing TIFD's share. This is far afield from the straightforward offset typically resulting when recoupment applies and suggests that the "same parties" requirement is unsatisfied.[19]

I need not and do not rest my decision on that ground, however. As noted above, another requirement of the recoupment doctrine is that the defendant's claim must arise out of the same transaction as the plaintiff's claim.[20] Here, neither TIFD's primary claim, which involves the method by which Cumulative Payout is calculated under the Partnership Agreement, nor its request that the court determine the "appropriate" Cumulative Payout as of a recent date, has anything to do with TIFD's alleged breaches of the Partnership Agreement. To the extent that TIFD's claims arise out of any "transaction" at all, that transaction was the dispute between the parties regarding the interpretation of Cumulative Payout and the ensuing decision by TIFD to dissolve the Partnership, a "transaction" to which TIFD's alleged past

**19.** Moreover, certain authorities suggest that even where the plaintiff's primary claim is a damages claim asserted against an equity holder in her individual capacity, she cannot assert the entity's derivative claims as a recoupment defense, because the same parties requirement would be unsatisfied. *Cf.* 80 C.J.S. *Set-off and Counterclaim* § 72 (2000) ("In accordance with the general rules requiring mutuality of the debts or demands, ordinarily a claim against the plaintiff in a representative capacity cannot be set off in a suit brought in his or her individual capacity, and vice versa, and an individual demand against the plaintiff suing in a representative capacity cannot be counterclaimed. Thus, the director of a corporation, sued in an individual capacity, cannot assert a derivative claim that could only be asserted by the corporation, itself, as a counterclaim." (footnotes omitted)); *Id.* § 81 ("Ordinarily, in an action against one partner for a debt due by him or her, a debt due to the partnership cannot be pleaded by way of set-off or counterclaim."); 20 Am. Jur. 2d *Counterclaim, Recoupment, and Setoff* § 75 (1995) ("In the absence of a statute or a specific agreement between the parties, an individual partner sued for his or her individual debt or claim cannot set off a partnership claim.").

**20.** *See MCI Telecomm. Corp.,* 1990 WL 91100, at *13; *Floyd v. Ballenger,* 258 A.2d 911, 913 (Del.Super.1969).

breaches of the Partnership Agreement are unrelated.

In response to this line of argument, Fruehauf cites isolated statements in various cases and authorities suggesting that, in contract cases, a defendant may assert a recoupment defense so long as the alleged breach underlying that defense arises under the same contract as the plaintiff's claim.[21] But, TIFD cites authorities suggesting otherwise, to wit, that the fact that a single contract is involved does not suffice to demonstrate that the necessary transactional nexus exists.[22] More importantly, most of the authorities cited by Fruehauf address contracts involving one-off transactions, such as loans or sales of goods or services, in which it is sensible to consider the plaintiff's own performance under the contract in evaluating its claim for damages against the defendant,[23] and counsel for Fruehauf readily admitted that he could find no case addressing a recoupment claim similar to the one involved here, where a party to a partnership agreement or other organizational document (e.g., a certificate of incorporation) establishing a long-term, ongoing relationship countered a plaintiff's claim under that agreement made at the end of the organization's life by seeking to resuscitate stale claims that the plaintiff long ago breached the agreement in a manner that is entirely unrelated to the plaintiff's present claims.

■■■ All this is to say that the authorities discussing recoupment do not provide me with much aid in determining whether the Recoupment Claim satisfies the requirement of a transactional nexus to TIFD's claims. Fundamentally, however, that requirement must be interpreted with an eye towards the central purpose of recoupment, which is to "avoid needless delay and unnecessary litigation" by permitting a defendant to assert in one action any defenses she may have arising out of the same factual core as the plaintiff's claims.[24] Indeed, a fair reading of the authorities suggests that it is the existence of this common factual core that justifies disregarding statutes of limitation when recoupment claims are asserted defensive-

**21.** *See, e.g., NVF Co. v. New Castle County,* 276 B.R. 340, 353 (D.Del.2002) (citing Black's Law Dictionary 1275 (6th ed. 1990), which defines "recoupment" as the "right of the defendant to have a deduction from the amount of the plaintiff's damages, for the reason that the plaintiff has not complied with the cross-obligations or independent covenants arising under the same contract."), *aff'd,* 61 Fed.Appx. 778, 2003 WL 328428 (3d Cir. Jan. 21, 2003).

**22.** 80 C.J.S. *Set-off and Counterclaim* § 37 (2000) ("[O]ne contract alone is not sufficient to establish a 'single transaction,' for purposes of the requirement under the recoupment doctrine that countervailing demands of parties arise from the same transaction, since separate transactions may occur within the confines of the contract.").

**23.** *See, e.g., Boone v. Nat'l Sav. & L. Ass'n, F.A. v. Crouch,* 47 S.W.3d 371 (Mo.2001) (where lender sued loan guarantor to enforce guaranty, guarantor could assert that lender's alleged violation of Equal Credit Opportunity Act ("ECOA") rendered the guaranty unenforceable as a recoupment defense to lender's claim even though statute of limitations on affirmative ECOA claim had already run).

**24.** 20 Am. Jur. 2d *Counterclaim, Recoupment, and Setoff* § 75 (1995); *see also* 80 C.J.S. *Setoff and Counterclaim* § 14 (1995) ("In general, the common object of the various forms of cross demand, such as recoupment, set-off, counterclaim, and the like ... is to avoid and prevent circuity of action and multiplicity of suits by allowing the entire controversy between the parties to be litigated and finally determined in one action, allowing disposition of all claims at once, wherever this can be done with entire justice to all parties before the court.").

ly.[25] Thus, where the plaintiff's claim and the defendant's "defense" are factually unrelated, the defendant should not be permitted to assert that defense under the rubric of recoupment. To hold otherwise would permit defendants to avoid statutes of limitation by creative pleading without serving the efficiency concerns underlying the doctrine, and would turn a narrow equitable doctrine designed to permit a summing up of liabilities in a tightly connected factual dispute into a wide-ranging license to revive a relationship's worth of stale grievances, which long predate the fresh dispute that brings the parties to court. To sanction such inefficiency and inequity in the name of recoupment is inadvisable.

Put simply, it makes little sense as a matter of policy to interpret the transactional nexus requirement so broadly as to permit a party to sit on its contractual rights and wait until dissolution to assert its claims. By that time, much of the evidence pertinent to those claims, such as testimony of employees involved in the relevant events who have long-since left the enterprise, might be unavailable or less reliable, and the plaintiff might be unable to mount a successful defense. Moreover, when a significant amount of time passes after a dispute arises and no claim is ever filed against a party, that party tends to assume that the dispute has been laid to rest. If parties entering into long-term relationships with one another can never be assured that they can move along in their relationship without remaining exposed to potential liability for events in the distant past, not only will the repose considerations embodied in statutes of limitations and the doctrine of laches be subverted, but the risk created by this uncertainty will make businesspersons less willing to commit capital to profit-generating enterprises such as partnerships for fear that every action or inaction they take during the life of the partnership might come back to haunt them at the relationship's end.

I therefore reject the public policy-based argument raised by counsel for Fruehauf for the first time at oral argument. Although he conceded that Fruehauf had the legal ability to bring its breach of contract claims on behalf of the Partnership when they arose, he contended that it makes policy sense for partners who sign partnership agreements containing payout provisions like the Cumulative Payout provision, in which the allocation of benefits to partners is not based on a simple pro rata distribution, to be able to use the doctrine of recoupment to argue at the time of liquidation that they are in fact entitled to a larger share of the remaining partnership pie than a strict application of the partnership agreement warrants because one or more of the other partners breached the agreement at some time and that breach caused a loss to the partnership that in effect gave the breaching partners a larger share of the pie than they deserved. The reason why this should be so is that if partners are required to duke it out over disagreements about alleged breaches of duty as they arise (or, more precisely, before the statute of limitations has expired), that will interfere with the effective functioning of partnerships, which requires that partners maintain amicable relations. In support of this argument, counsel for Fruehauf argued that under earlier common law, partners could bring

---

**25.** *See, e.g., Luckenbach S.S. Co. v. U.S.,* 312 F.2d 545, 549 n. 3 (2d Cir.1963) ("The defense of recoupment, which arises out of the same transaction as plaintiff's claim, survives as long as the cause of action upon the claim exists." (quoting *Pennsylvania R. Co. v. Miller,* 124 F.2d 160, 162 (5th Cir.1941))).

actions for breach of fiduciary duty against their partners only after triggering dissolution, and so it would not be unreasonable to have partners wait until that time to bring certain claims involving conduct that occurred during the life of the partnership, no matter when that conduct occurred.[26]

I find this line of argument unpersuasive, for the reasons I have stated, as it injects inefficient and inequitable uncertainties into the internal affairs of businesses. No doubt because of those considerations, the old common law rule that Fruehauf claims existed, to the extent it was ever an accurate description of the law, does not currently apply to Delaware limited partnerships. Indeed, that rule was explicitly overridden by the General Assembly.[27] Our state's public policy therefore rejects the very premise of Fruehauf's argument, as this court lucidly explained in *Fike v. Ruger*,[28] and instead encourages the timely prosecution of claims involving the internal affairs of business entities.

For all these reasons, I decline to warp the doctrine of recoupment to permit

---

**26.** Apparently, counsel was referring to the old common law rule which required that actions for partnership accounting be brought post-dissolution. *See Fike v. Ruger*, 754 A.2d 254, 262–65 (Del.Ch.1999) (discussing development of common law and statutory law governing ability of partners to bring claims during life of partnership), *aff'd*, 752 A.2d 112 (Del.2000).

**27.** *See 6 Del. C.* § 15–405 (providing that a partnership may sue a partner for breach of the partnership agreement or violation of duty to the partnership and a partner may sue another partner to enforce its rights under the partnership agreement, but stating that "[t]he accrual of, and any time limitation on, a right of action for a remedy under this section is governed by other law. *A right to an accounting upon a dissolution and winding up does not revive a claim barred by law.*" (emphasis added)).

**28.** In *Fike*, Vice Chancellor Lamb addressed the analogous argument that the defenses of statutes of limitations and laches did not apply to plaintiff-joint venturers' claims challenging loan agreements between a joint venture and certain of its members because those claims were really ones for settlement of partnership accounts upon dissolution. That argument was based on § 1543 of the Delaware Uniform Partnership Law (the "DUPL"), then in effect, which stated that "[t]he right to an account of his interest shall accrue to any partner ... at the date of dissolution in the absence of any agreement to the contrary." 6 *Del. C.* § 1543 (1999). The court first noted that the plaintiffs had the express right under the joint venture agreement ("JVA") to a reso-

lution at any time via arbitration of any claims arising under the JVA, including the claims involving the loan agreements. He then stated that "[i]n the circumstances, little or no purpose would be served by adopting a rule that allows [the] joint venturers to sleep on their rights until an event of dissolution or termination occurs and the default provisions of the partnership statute give them a right to an accounting." *Fike*, 754 A.2d at 263. Then, after considering how partnership law had developed from the old general common law rule "that actions for accounting should be brought post-dissolution," *id.*, through the DUPL, which included a provision authorizing accounting actions prior to dissolution, *see 6 Del. C.* § 1522 (1999), and up to § 405(c) of the Revised Uniform Partnership Act—later codified in Delaware at 6 *Del. C.* § 15–405, quoted above, *see supra* note 27— the court concluded that the plaintiffs' *"right* to bring an action under 6 *Del. C.* § 1522 created an *obligation* to do so in a timely manner, or else to risk forfeiture of their claims, even in a post-dissolution accounting under 6 *Del. C.* § 1543." *Fike*, 754 A.2d at 264. The Delaware Supreme Court affirmed Vice Chancellor Lamb's decision. *Fike v. Ruger*, 752 A.2d 112 (Del.2000).

This case, of course, does not directly involve either an action for accounting or any of the statutory provisions governing general partnerships. Nonetheless, Vice Chancellor Lamb's reasoning in *Fike* is applicable here. Fruehauf had the right to bring breach of contract claims against TIFD on the Partnership's behalf when those claims arose, and the doctrine of recoupment cannot excuse its failure to do so in a timely manner.

Fruehauf to assert time-barred breach of contract claims as either a counterclaim or a defense to TIFD's unrelated requests for relief. I therefore grant TIFD's motion for judgment on the pleadings and dismiss the Recoupment Claim in its entirety.

### B. *Fruehauf's Motion To Dismiss Certain Claims As Unripe*

■ I now turn to Fruehauf's motion to dismiss, which is based on the theory that the entire preceding analysis was pointless because its own Recoupment Claim and one of TIFD's requests for relief are not ripe for decision. As Fruehauf itself ultimately conceded, that theory is based on the mistaken (albeit not unjustifiable) assumption that by asking the court to "determin[e] the appropriate Reversion Point and Cumulative Payout pursuant to the Partnership Agreement"[29] in the second *ad damnum* clause of its complaint, TIFD was requesting that the court determine the *point in time* at which Cumulative Payout would be greater than or equal to zero and the flip from Phase I to Phase II would occur.

Laboring under this misunderstanding, Fruehauf thus argued that this request was not yet ripe, because such a determination would necessarily depend on uncertain factors influencing the future revenues and costs of the Partnership, such as the volumes of gas that will be sold and the prices at which they will be sold. Moreover, because the Recoupment Claim was supposedly asserted in response to this particular claim as Fruehauf understood it—i.e., because a consideration of the amount of revenues that the Partnership lost due to TIFD's breaches would affect the running balance of Cumulative Payout and therefore would affect "when" the flip would occur—the Recoupment Claim itself was assertedly also not yet ripe. Thus, Fruehauf sought dismissal without prejudice of both TIFD's request in the second *ad damnum* clause and the Recoupment Claim.

In response to Fruehauf's motion, TIFD clarified that it never intended to ask the court to determine "when" the Reversion Point would occur. Rather, it simply wanted the court, once having decided on the appropriate method for calculating Cumulative Payout, to perform that calculation as of a recent month in the past for which complete past financial data was available. Such a calculation would involve no speculation, since it would depend entirely on matters that have already occurred, i.e., the Monthly Payouts and Capital Contributions that have been made as of that month. Moreover, calculating Cumulative Payout as of a recent month will be useful for the parties going forward, as it would settle any disagreement as to how past events figure into the current running balance, so that when the Partnership's affairs are completely wound up and the final liquidating payments are made, calculating Cumulative Payout will involve only an adjustment of that balance taking into account the limited financial data involving events that occur between the month for which Cumulative Payout was calculated by the court and the time of the final payment.

Thus clarified, it is clear that both TIFD's claim in the second *ad damnum* clause and the Recoupment Claim are ripe for decision. TIFD seeks a calculation of the running balance under the Cumulative Payout provision. Fruehauf concedes that in performing that calculation, the court must, at the very least, determine whether the Recoupment Claim may be validly asserted in response to TIFD's claim. Moreover, if that Claim may be asserted,

---

29. Am. Compl. at 9 ¶ b.

then the court would have to determine 1) whether TIFD breached the Partnership Agreement, and if so, 2) whether those breaches caused a loss in revenues to the Partnership. There is no question that an actual case or controversy exists between the parties with respect to each and every one of these questions, and that no speculation regarding future events is necessary to answer them.

Nonetheless, Fruehauf argues that I should neither calculate Cumulative Payout as of a recent month nor even determine the initial question of the Recoupment Claim's sustainability, because other disputes regarding the winding up and liquidation process may arise in the future, such as disputes over the amount of reserves to establish for contingent liabilities, and therefore these issues should be put off until such disputes come to fruition. I fail to see how the mere possibility that the parties might have more arguments in the future affects the court's authority to decide actual arguments that they are having now. If bones of contention surface later, the parties can then decide whether to seek judicial resolution; counsel for Fruehauf himself stated that if Fruehauf wins on the primary issue in this case—how Cumulative Payout is calculated—that will be such a significant victory that it might render all other disputes immaterial.

Finally, Fruehauf's argument that its own Recoupment Claim is unripe comes with little grace. By its own admission, Fruehauf intends—absent a judicial order precluding it from doing so—to grant itself its Recoupment Claim as liquidator and force TIFD to sue at an even staler time claiming that it did not commit wrongdoing in the late 1990s. In this case, Fruehauf threatened TIFD with time-barred allegations of wrongdoing and obtained a trial continuance so the court could rationally address the sustainability of those allega-

tions. For it now to argue that the Recoupment Claim is not ripe is not the most edifying example of American gumption.

For these reasons, TIFD's request for a declaration concerning the "appropriate Reversion Point and Cumulative Payout pursuant to the Partnership Agreement" as of a recent month for which financial data is available is ripe, and Fruehauf's motion to dismiss that claim, as well as its own Recoupment Claim, is denied.

### III. *Conclusion*

Fruehauf's motion to dismiss, without prejudice, the second *ad damnum* clause of TIFD's complaint and its own Recoupment Claim is denied. TIFD's Rule 12(c) motion for judgment on the pleadings is granted and Fruehauf's Recoupment Claim is dismissed, with prejudice, in its entirety.

IT IS SO ORDERED.